UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID T. MARRETT, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | 1:24-cv-00300-JAW |
| | ) | |
| AROOSTOOK COUNTY FEDERAL | ) | |
| SAVINGS & LOAN, et al., | ) | |
| | ) | |
| Defendants | ) | |

**RECOMMENDED DECISION AFTER REVIEW OF COMPLAINT**

After their house suffered water damage and their lender pursued foreclosure proceedings in state court, Plaintiffs David and Sandy Marrett commenced this action against a mortgage lender, an insurance company, two law firms, a real estate agency, an employee of the lender and the real estate agency, and a state court judge. (*See* Complaint, ECF No. 1.) In addition to the complaint, Plaintiffs filed an application to proceed without prepayment of fees, (ECF No. 3), which application the Court granted. (Order, ECF No. 5.) In accordance the governing statute, a preliminary review of Plaintiff's complaint is appropriate. 28 U.S.C. § 1915(e)(2).

Following a review of Plaintiff's allegations, I recommend the Court dismiss the complaint.

## FACTUAL ALLEGATIONS[1]

In 2004, Plaintiffs purchased a house located at 35 York Street in Caribou, Maine. In November 2009, Plaintiffs executed a note for a $94,500 loan from Aroostook County Federal Savings and Loan (Defendant ACFSL or the bank), which loan was secured by a mortgage on the house. Plaintiffs lived in the house for approximately thirteen years before they rented the house to others.

In April 2020, an employee of Defendant ACFSL contacted Plaintiffs, who lived in Ohio, because Plaintiffs had not paid the 2019 or 2020 taxes on the property. Plaintiffs explained that they were experiencing financial difficulties, their tenants were unable to pay rent consistently, and the pandemic prevented travel to Maine at that time. In June 2020, the bank employee encouraged Plaintiffs to sell the property to an investor familiar to the bank who had offered Plaintiff $30,000 for the house; Plaintiffs declined. In September 2020, Plaintiffs signed an agreement to pay the taxes using some of the equity in the house and to begin paying $150 per month into an escrow account to cover future property taxes.

In 2021, for multiple reasons, Plaintiffs fell behind on their loan payments. In late August 2021, the bank employee contacted Plaintiffs about the missed payments. Plaintiffs agreed to send a payment as soon as possible and informed the employee that they planned to invest money to change the property to a two-family home to use as a residence and generate income. On September 14, 2021, Defendant ACFSL sent Plaintiffs a Notice to

---

[1] The facts are drawn from Plaintiffs' complaint, the attachments to the complaint, and to the extent that the documents are helpful to understand Plaintiffs' filings, the undisputed record of the related cases.

Cure Default with a demand to pay $5,980 within thirty-five days to avoid foreclosure. The amount to cure the default was based on (1) three missed payments of $545 on July 1, August 1, and September 1; (2) three charges of $150 for the tax and insurance plan payments due July 1, August 1, and September 1; (3) two late charges of $22 dated July 15 and August 15, and (4) a charge of $3,850 for a principal advance for the 2019 and 2020 taxes.

On October 24, 2021, Plaintiffs spoke with Defendant Beth Henderson, the bank's Caribou branch manager, who encouraged Plaintiffs to sell the house and to use the services of Defendant Progressive Realty (Defendant Progressive) to facilitate the sale. On October 25, 2021, Plaintiffs informed Defendant ACFSL that Plaintiffs listed the house for sale with Defendant Progressive. On November 4, 2021, Defendant Henderson sent Plaintiffs and their broker an offer for a deed in lieu of foreclosure. Plaintiffs twice sought updates from their real estate agent, who said she would speak with the bank.

On November 18, 2021, Defendant Henderson inquired of Plaintiffs regarding the offer of a deed in lieu of foreclosure. She informed Plaintiffs that the bank recently sent a representative to the property to perform maintenance on the baseboard hot water heating system, restore water service to the house, arrange an oil delivery, and restart the boiler.[2] The utilities district began sending water bills to the bank rather than to Plaintiffs. The bank also purchased a force-placed insurance policy on the property and began adding

---

[2] Plaintiff's counterclaim against the bank in the foreclosure action alleged that restoration of water service was necessary to perform the maintenance and restart services because they had winterized the home prior to November 2021.

premiums of $45 per month to the balance Plaintiffs owed.[3]  The bank later added a $380

charge to the loan balance for the oil delivery.

Plaintiffs contacted their real estate agent, who recommended Plaintiffs accept the

bank's offer.  Plaintiffs then spoke with Defendant Henderson, who also told them they

should turn over the property.  Plaintiffs believed that the bank was attempting to get them

to forfeit the equity they had established in the property.  Plaintiffs instructed the bank to

cease any further communications with their real estate agent.  Plaintiffs later learned that

Defendant Henderson also worked for Defendant Progressive.

In January 2022, in connection with the bank's foreclosure efforts, Plaintiffs

demanded approximately $143,000 in damages from the bank.  In February 2022, the bank

responded that it properly handled the loan, and that if Plaintiffs needed additional time to

sell the property, the bank would be open to a proposal.  The bank also served Plaintiffs

with the foreclosure complaint.  Plaintiffs believed the one-month delay from the filing of

the complaint to service was an effort to prevent Plaintiffs from taking timely legal action

against the bank.  In March 2022, Plaintiffs filed an answer and counterclaim against the

bank alleging (1) breach of the duty of good faith and fair dealing by withholding

information about forbearance programs, (2) economic duress based on the property tax

agreement, (3) tortious interference with the contract with Defendant Progressive to sell

the house, (4) breach of contract by entering the property without notice, and (5) unfair

---

[3] Plaintiffs did not allege when Defendant ACFSL purchased the policy, but they asserted in their
foreclosure counterclaim that it was likely around November 18, 2021, which is consistent with a record of
loan transactions which Plaintiffs filed in the prior proceedings and which reflects insurance premiums
beginning mid-November 2021.

trade practices based on the recommendation to sell to an investor with whom the bank had a relationship.

In May 2022, one of Plaintiffs' relatives visited the property and heard running water.  Because her keys to the house no longer worked, the relative called the utilities district to shut off water to the house.  Plaintiffs returned to Maine and discovered extensive water damage to the house from approximately 1.8 million gallons of water that had flowed into the house through a burst pipe during the winter and spring.  Plaintiffs communicated with a loan servicing officer for Defendant ACFSL, learned the name and contact information for the force-placed insurance provider, Defendant Zurich Insurance Company (Defendant Zurich), and filed a claim online.  A few days later, a claims adjuster informed Plaintiffs that the claim was denied because the policy did not relate to the property at 35 York Street, and that the bank, not Plaintiffs, was the insured under the policy and the bank did not wish to proceed with a claim.

In June 2022, Plaintiffs began receiving communications from the law firm of Marden, Dubord, Bernier & Stevens (Defendant Marden Dubord), representing the bank. Plaintiffs characterize those and subsequent communications as condescending, dismissive, and an attempt to overwhelm and obstruct Plaintiffs' efforts to pursue the counterclaims.  In July and August 2022, Plaintiffs sought leave to amend their counterclaim in state court to add nearly thirty defendants and sixteen counts for relief, including document fraud, mail fraud, slander of title, forgery, violation of the Real Estate Settlement Practices Act (RESPA), conspiracy to defraud, home equity fraud, mortgage fraud, trespass, gross negligence, malicious destruction of property, environmental

contamination of property, violation of constitutional rights, insurance fraud, vicarious liability, and defamation of character. Because of the recusal of the judge presiding in Aroostook County, the foreclosure case was transferred from Aroostook County to Penobscot County, and Superior Court Justice Bruce Mallonee was assigned to the case. The court conducted a conference in the case in November 2022, which conference Plaintiffs describe as a biased and intimidating environment.

In January 2023, Plaintiffs sought to remove the foreclosure case to federal court. (Notice of Removal, 1:23-cv-00006-JAW, ECF No. 1.) The bank requested the case be remanded to state court. (Motion to Remand, 1:23-cv-00006-JAW, ECF No. 6.) The Court remanded the case in April 2023 because Plaintiffs had not timely removed the case. (Order, 1:23-cv-00006-JAW, ECF No. 17.) Meanwhile, in March 2023, the state court denied Plaintiff's motion to amend their counterclaim because (1) it would cause unfair prejudice and (2) the amendments would be futile as the proposed allegations failed to state an actionable claim. Before the federal court remanded the case, an attorney with Defendant Marden Dubord filed a copy of the state court's March 2023 order on the federal court docket.

In September 2023, Plaintiffs filed in state court a second motion for leave to file an amended counterclaim. In the proposed second amended counterclaim, Plaintiffs alleged against Defendant ACFSL claims for negligence and property damage, emotional distress and hardship, violation of the Real Estate Settlement Procedures Act, conspiracy to defraud, mortgage fraud, trespass, malicious destruction of property, environmental contamination of property, insurance fraud, and defamation of character. In October 2023,

during discovery in the state court proceedings, Plaintiffs learned from Defendant ACFSL's lawyer that a claim had been filed under the force-placed insurance policy. Plaintiffs returned to Maine before learning that no claim had been filed on their behalf.  In January 2024, the state court denied leave to amend the counterclaim based on futility of the amendments, and the court denied several other pending motions, including cross motions for summary judgment.  The parties continued to file various other motions in the state court foreclosure proceedings.

In July 2024, Plaintiffs filed a lawsuit in federal court against the Caribou Utilities District for breach of contract and violation of their constitutional rights.  (Complaint, 1:24-cv-00254-JAW, ECF No. 1.)  In August 2024, the Caribou Utilities District moved to dismiss the case.  (Motion to Dismiss, 1:24-cv-00254-JAW, ECF No. 9.) The motion is pending.  Plaintiffs then filed this lawsuit.

## LEGAL STANDARD

28 U.S.C. § 1915 is designed to ensure meaningful access to the federal courts for those persons unable to pay the costs of bringing an action.  When a party is proceeding without prepayment of fees, however, "the court shall dismiss the case at any time if the court determines," inter alia, that the action is "frivolous or malicious" or "fails to state a claim on which relief may be granted."  28 U.S.C. § 1915(e)(2)(B).  "Dismissals [under § 1915] are often made sua sponte prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints."  *Neitzke v. Williams*, 490 U.S. 319, 324 (1989).

When considering whether a complaint states a claim for which relief may be granted, courts must assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). A complaint fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The relevant question ... in assessing plausibility is not whether the complaint makes any particular factual allegations but, rather, whether 'the complaint warrant[s] dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible.'" *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 55 (1st Cir. 2013) (quoting T*wombly*, 550 U.S. at 569 n. 14).

Although a pro se plaintiff's complaint is subject to "less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the complaint may not consist entirely of "conclusory allegations that merely parrot the relevant legal standard," *Young v. Wells Fargo, N.A.,* 717 F.3d 224, 231 (1st Cir. 2013). *See also Ferranti v. Moran*, 618 F.2d 888, 890 (1st Cir. 1980) (explaining that the liberal standard applied to the pleadings of pro se plaintiffs "is not to say that pro se plaintiffs are not required to plead basic facts sufficient to state a claim").

## DISCUSSION

### A.    Abstention

Some of Plaintiffs' claims are not appropriate for resolution in this Court because the relief they seek would require an improper degree of interference with state court proceedings. For example, under the *Rooker-Feldman* doctrine, if the foreclosure case had

8

reached a final order before Plaintiffs filed their complaint, this Court would lack jurisdiction over certain claims to the extent the relief they seek would imply the invalidity of the state court's judgment.[4]  Similarly, if the state proceeding has ended or concludes before the federal proceeding ends, claim or issue preclusion[5] would prohibit Plaintiffs from relitigating matters decided in the state court foreclosure case.  The same is true for the order in the case that was removed from state court.

Further, if the state court case is pending, the doctrine of *Younger* abstention[6] would likely require dismissal to the extent Plaintiffs ask this Court to stop the state foreclosure proceeding or reverse a decision in a pending state foreclosure case.  *See Toczek v. Alvord*, 841 F. App'x 263, 266 (2d Cir. 2021) (finding *Younger* abstention applicable when federal plaintiffs complained of adverse rulings and sought to block enforcement in pending state

---

[4] The *Rooker-Feldman* doctrine "divest[s] lower federal courts of jurisdiction to hear cases brought by state-court losers complaining of injuries caused by state-court judgments that were rendered before the district court proceedings commenced and invite district court review and rejection of those judgments." *Klimowicz v. Deutsche Bank Nat'l Tr. Co.*, 907 F.3d 61, 64-65 (1st Cir. 2018) (citation and quotation marks omitted); s*ee generally*, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

[5] The doctrine of issue preclusion prevents "a party from relitigating an issue actually decided in a prior case and necessary to the judgment." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020).  The doctrine of claim preclusion prevents the same parties in a prior case from litigating in a new case "all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." *Id.* (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)).

[6] As a general rule, *Younger v. Harris*, 401 U.S. 37 (1971), requires abstention from the exercise of jurisdiction when a plaintiff seeks relief in federal court from a pending state criminal prosecution or analogous civil enforcement proceeding, *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72–73, 78 (2013), including certain proceedings involving the enforcement of state-court orders and judgments. *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 192–93 (1st Cir. 2015).  Abstention is mandatory absent "extraordinary circumstances," such as: (1) an action "brought in bad faith . . . for the purpose of harassment," (2) "the state forum provides inadequate protection of federal rights," or (3) the challenged "state statute is flagrantly and patently violative of express constitutional prohibitions" or there is "a facially conclusive claim of [federal] preemption."  *Sirva Relocation,* 794 F.3d at 192, 197.

foreclosure case); *El Bey v. Bellis*, No. 3:19-CV-336 (KAD), 2019 WL 2502929, at *4 (D. Conn. June 17, 2019) ("This case implicates the third category of cases for which abstention is mandated. Indeed, a state foreclosure action is one of the types of actions in which federal courts abstain from interfering, pursuant to *Younger*") (quotation marks and modifications omitted).

Other courts, including the First Circuit, have noted that even if the other doctrines do not apply, the doctrine of *Colorado River* abstention[7] militates against the exercise jurisdiction where a party attempts to raise claims in federal court based on the party's dissatisfaction with the course of a parallel state court case:

> In our view, it would be unthinkable that every time a state . . . court defendant became dissatisfied with that court's provisional resolution of some issue and there was diversity of citizenship, it could rush over to the federal courthouse in the hope of obtaining a more favorable determination. Such a practice, if ordinarily permitted, would complicate and fragment the trial of cases, as well as cause friction between state and federal courts.

*Fuller Co. v. Ramon I. Gil, Inc.*, 782 F.2d 306, 309–10 (1st Cir. 1986). The First Circuit's reasoning likely applies to some or all the claims asserted in Counts I, II, VI, VII, and VIII.

---

[7] Federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them, but they are permitted to abstain under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), in limited exceptional circumstances for reasons of "wise judicial administration that counsel against duplicative lawsuits." *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18, 27 (1st Cir. 2010) (internal quotations omitted). Courts examine the following non-exhaustive factors:

> (1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 71–72 (1st Cir. 2005).

Even if the Court were to assume that none of the threshold issues presents an obstacle to Plaintiffs' claims, as discussed below, dismissal is warranted because Plaintiffs have not alleged sufficient facts to support any of the claims asserted.

## B.    Due Process Claim

In Count I, Plaintiffs assert a claim under 42 U.S.C. § 1983 for an alleged due process violation by the state court judge, the bank, and the insurance company.  Given that § 1983 provides a remedy against individuals acting under color of state law, the claims against the Defendant ACFSL and Defendant Zurich fail because they are private actors, not state actors.  *See generally*, *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 8–12 (1st Cir. 2015) (summarizing rare circumstances where individuals other than government employees may be sued under § 1983).  The judge is a state actor, but the doctrine of judicial immunity bars the claim against him because the claim arose from his official judicial activities in the foreclosure case. *Butz v. Economou*, 438 U.S. 478, 512 (1978) (a dissatisfied litigant "in one forum will frequently seek another, charging the participants in the first with unconstitutional animus.  Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions" free from the threat of subsequent lawsuits) (citation omitted).

## C.    Fraudulent Misrepresentation

In Count II, Plaintiffs assert a claim for "fraud and misrepresentation" against the bank, the insurance company (Defendant Zurich), and the two law firms.  The claim rests on Plaintiffs' contention that that the bank misclassified the house as non-owner-occupied

to avoid certain legal restrictions on its ability to obtain a force-placed insurance policy
and to foreclose on the property more quickly.

> To establish a claim of fraud or fraudulent misrepresentation, a party must
> demonstrate . . . by clear and convincing evidence:
>
> (1) A party made a false representation,
>
> (2) The representation was of a material fact,
>
> (3) The representation was made with knowledge of its falsity or in reckless
> disregard of whether it was true or false,
>
> (4) The representation was made for the purpose of inducing another party to
> act in reliance upon it, and
>
> (5) The other party justifiably relied upon the representation as true and acted
> upon it to the party's damage.

*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280, 1286–87.  Plaintiffs' allegations and
related filings do not provide any information about when or how the representation of the
house as non-owner-occupied was communicated to them.  The sole reference to the phrase
in the record appears to be in the caption of the foreclosure complaint, which contained the
words "Mediation Exempt - Non-owner occupied."  The reference is evidently to a
provision of state law, 14 M.R.S.A § 6321-A, which requires notice within a foreclosure
complaint of a state mediation program whenever the subject property is an owner-
occupied residential property.

    The record does not suggest that the state court found the representation to be
inaccurate and Plaintiffs' allegations support the characterization of the house as non-
owner occupied.  Plaintiffs' filings establish that at the time the foreclosure action was
commenced, they lived in Ohio, and while another family had rented the property, no one

was living on the property.  Plaintiffs argue that their expressed intention to move back to Maine is relevant to the occupancy status of the house for purposes of certain other provisions in federal law, *see infra* Part D, but there does not appear to be any relevance under the state law that Defendant ACFSL referenced in the foreclosure complaint. Plaintiffs, therefore, have not alleged any facts that would support a finding that the characterization of the house as non-owner-occupied was knowingly false or even inadvertently erroneous.

Even if characterization on the foreclosure complaint was somehow erroneous, Plaintiffs have not alleged an actionable claim. Plaintiffs allege the representation mischaracterized their status relative to the house – something they knew at the time of the representation. Under the circumstances, Plaintiffs cannot reasonably claim that they accepted the representation as true and acted in reliance on a misrepresentation.

## D.   Real Estate Settlement Procedures Act Claim

In Counts III and IV, Plaintiffs allege Defendants ACFSL and Zurich violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601–17, and its implementing regulations, 12 C.F.R. § 1024.[8]  RESPA imposes requirements on lenders and loan servicers to promote transparency and communication between borrowers and lenders. *McGahey v. Fed. Nat'l Mortg. Ass'n*, 266 F. Supp. 3d 421, 438 (D. Me. 2017).

---

[8] Pursuant to the Dodd Frank Act, the Consumer Financial Protection Bureau (CFPB) issued consolidated regulations regarding mortgage servicers and disclosure requirements previously issued under RESPA and the Truth in Lending Act.  *See Mackiewicz v. Nationstar Mortg., LLC*, No. 615CV465ORL18GJK, 2015 WL 13814879, at *4 (M.D. Fla. June 25, 2015).

Under the law, unless within 60 days after discovering an error and before the commencement of a legal action, the servicer provides notice to the borrower and makes the necessary adjustments to prevent excess payment, any loan servicer who fails to comply with any provision of § 2605 is liable for: (1) "any actual damages to the borrower as a result of the failure," (2) attorney's fees and costs, and (3) if there was a pattern or practice of noncompliance, up to $2,000 of additional statutory damages.  12 U.S.C. § 2605(f)(1), (3), (4).  As relevant here, § 2605 provides that a loan servicer may not "obtain force-placed hazard insurance unless there is a reasonable basis to believe the borrower has failed to comply with the loan contract's requirements to maintain property insurance," or "fail[ed] to comply with any other obligation" contained in the CFPB implementing regulations. *Id.* § 2605(k)(1)(A), (E).

Plaintiffs evidently contend that the statute and regulations required the bank to (1) provide notices and wait forty-five days before adding force-placed insurance charges, and (2) wait at least 120 days after Plaintiffs defaulted before sending them a notice of default and right to cure letter.  As explained below, Plaintiffs' discernible RESPA claims fail. The claims against Defendant Zurich also fail because none of the provisions Plaintiffs raised imposes any obligations or restrictions on insurance companies.

## 1.      Notice of Force-Placed Insurance

Unless a servicer complies with other requirements in § 2605 of the statute and § 1024.37 of the regulations, the servicer is deemed not to have a reasonable basis to believe the borrower lacks hazard insurance.  Servicers may not impose charges for force-placed insurance without first completing a forty-five day process consisting of: (1) sending a

written notice to the borrower regarding the obligation to maintain hazard insurance and the consequences of failing to provide evidence that the borrower has obtained it, (2) sending a reminder notice thirty days after the first notice, and (3) waiting fifteen days for a response after sending the reminder notice.  12 U.S.C. § 2605(l)(1).  The implementing regulation also includes information regarding the content and format of the required notices.  12 C.F.R. § 1024.37(c)(1)(i).

Through their allegations, Plaintiffs suggest there was some flaw in the notice process regarding the force-placed insurance, but they do not identify the flaw or describe the content or timing of the notices so that the flaw might be identified.  The extent of Plaintiffs' allegations is essentially that (1) the bank added insurance costs to their loan balance, and (2) the bank somehow classified the property as "non-owner-occupied."  The two assertions, without more, are not enough to state a plausible RESPA claim.  As discussed above, the only discernible way the bank classified the property as non-owner-occupied was in connection with a provision of state law and the classification in that context is not actionable.

Conceivably, a lender could fail to send the required notices and simply add the insurance costs to the balance of the loan.  Plaintiffs have not alleged that is what occurred.  Furthermore, a plaintiff must allege more than a conceivable scenario.  *See Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29 (1st Cir. 2010) (to avoid dismissal, a plaintiff "must state a plausible, not a merely conceivable, case for relief").  Notice of the nature of the violation is necessary as it would inform the defenses that might be available to a lender.  For instance, if the borrower brought a RESPA claim based on

the lack of notice, a lender might defend against the claim by raising the purpose of the loan, as the relevant RESPA provisions and regulations do not apply to an extension of credit primarily for business, commercial, or agricultural purposes.[9]  Given the lack of details on the notice issue, Plaintiffs have failed to allege sufficient facts to support a claim under RESPA.

Finally, even if Plaintiffs had adequately alleged a duty under RESPA based on their intent to return to the property in the future and thus had alleged a violation of the force-placed insurance notice rules, Plaintiffs would only be entitled to the actual damages caused by the inadequate notice.[10]  Because the insurance charges were evidently not imposed until November 2021, two months after the September 2021 notice of default and right to cure letter, and because the cost of the insurance premiums ($45 per month) was relatively small compared to the size of the deficiency at the time of the letter (nearly

---

[9] 12 C.F.R. § 1024.5(b)(2).  The term business purpose is defined in a different regulation, 12 CFR 1026.3(a), which Plaintiffs cited.  According to CFPB's interpretation of that definition:

> 4. **Non-owner-occupied rental property.** Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes. This includes, for example, the acquisition of a warehouse that will be leased or a single-family house that will be rented to another person to live in.  If the owner expects to occupy the property for more than 14 days during the coming year, the property cannot be considered non-owner-occupied and this special rule will not apply.  For example, a beach house that the owner will occupy for a month in the coming summer and rent out the rest of the year is owner occupied and is not governed by this special rule.

12 C.F.R. Supplement 1 (Part 1) to § 1026, Comment 3(a)-4.

[10] Plaintiffs referenced other unspecified properties and alleged a pattern or practice of wrongful foreclosures and schemes to intentionally cause water damage for the insurance money, but there are no facts included to support the conclusory allegations.

$6,000)[11], the filings would not plausibly permit an inference that the foreclosure or any resulting emotional damages were caused by an insurance notice issue as opposed to other factors. *See Ortiz v. NewRez LLC*, No. CV 23-11222, 2024 WL 1521585, at *3 (D. Mass. Apr. 9, 2024) (concluding that the plaintiff had not stated a RESPA claim based on the failure to plead adequately that the alleged RESPA violation caused actual damages).

### 2.      120-day Waiting Period

Other portions of the complaint when considered with Counts III and IV could be construed as an attempt to assert a claim under RESPA and another regulation, 12 C.F.R. § 1024.41.  The regulation creates a protected pre-foreclosure review period:

> A servicer shall not make the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process unless:
>
> > (i) A borrower's mortgage loan obligation is more than 120 days delinquent;
> >
> > (ii) The foreclosure is based on a borrower's violation of a due-on-sale clause; or
> >
> > (iii) The servicer is joining the foreclosure action of a superior or subordinate lienholder.

*Id.* § 1024.41(f)(1).  According to Plaintiffs, the bank violated the pre-foreclosure review period regulation by sending a notice of default and right to cure letter after only seventy-five days in default rather than the required 120 days.  Plaintiffs' assertion, however, is not actionable.

---

[11] Approximately $1,635 was for missed mortgage payments, $3,850 was for back taxes the lender had paid, approximately $50 was for late fees, and $450 was for missed escrow payments for the next year's taxes.  Although Plaintiffs argue that the lender was not entitled to include the missed escrow payments in the amounts needed to cure the default, the point remains the same even if the Court were to assume the amount needed to cure the default was approximately $5,500.

First, the agency's interpretation of the regulation clarifies that the notice of default and right to cure letter do not constitute a "first notice or filing required . . . for any judicial or non-judicial foreclosure process."   According to the CFPB guidance, whether a document is a first notice or filing depends on the relevant state law:

> i. Where foreclosure procedure requires a court action or proceeding, a document is considered the first notice or filing if it is the earliest document required to be filed with a court or other judicial body to commence the action or proceeding (e.g., a complaint, petition, order to docket, or notice of hearing).
>
> . . .
>
> iv. A document provided to the borrower but not initially required to be filed, recorded, or published is not considered the first notice or filing on the sole basis that the document must later be included as an attachment accompanying another document that is required to be filed, recorded, or published to carry out a foreclosure.

12 C.F.R. Supplement Part 1 to § 1024.41 Comment (f)(1).

Under Maine law, the earliest document that must be filed with a court to commence a proceeding is the foreclosure complaint.  *See* 14 M.R.S.A. § 6321.  If the property is the borrower's primary residence, a different provision requires the lender to wait thirty-five days after sending a notice of default and right to cure letter before filing a foreclosure complaint.  *Id.* § 6111.  As part of the foreclosure complaint, the Maine statutes only require a lender to certify that it followed the procedures of § 6111; there is no requirement to file the notice of default, though lenders often include a copy as an attachment to the complaint. Therefore, the 120-day waiting period applies to foreclosure complaints in Maine but not notices of default and the right to cure.  Because Plaintiffs do not dispute that the January

2022 foreclosure complaint was filed more than 120 days after the August 2021 default, Plaintiffs have not stated a claim for a RESPA violation.

More fundamentally, even if Plaintiffs were correct that the notice of default was subject to the 120-day waiting period, the RESPA claim would still fail. "The procedures set forth in §§ 1024.39 through 1024.41," which includes the waiting period, "only apply to a mortgage loan that is secured by a property that is a borrower's principal residence." 12 C.F.R. § 1024.30. Regardless of the more lenient definition of non-owner-occupied rental property, Plaintiffs have not alleged that the house was their primary residence. To the contrary, Plaintiffs allege they were living out-of-state for a considerable time before the notice of default, the foreclosure, and the alleged damage to their property.

## E.     Breach of Contract

Plaintiffs claim in Count V that Defendant ACFSL breached the mortgage contract by sending the notice of default and right to cure letter before Plaintiffs had been at least 120 days delinquent and by failing to consider Plaintiffs' plan to convert the property into two units and live in one unit while renting the other unit to a tenant. To establish a breach of contract claim, a plaintiff must show: "(1) breach of a material contract term; (2) causation; and (3) damages." *Maine Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248, 1250. Plaintiffs did not cite any portion of the mortgage contract that obligated the bank to perform either of the duties Plaintiff contends the bank breached. A review of the mortgage contract (which was submitted to the court in the case that was removed from state court) does not reveal any such requirements. Plaintiffs,

therefore, have not plausibly alleged a material breach of a contractual obligation or damages proximately caused by the breach of a contract.

## F.     Abuse of Process

In Count VI, Plaintiffs contend that the two law firms committed an abuse of process tort by submitting the state court order to the federal court in the removal case while the motion to remand was under consideration.  An abuse of process occurs when a party to a lawsuit uses legal process "in a manner not proper in the regular conduct of the proceedings" and has "an ulterior motive" for doing so.  *Nadeau v. State*, 395 A.2d 107, 117 (Me. 1978); *see also*, *Kinderhaus N. LLC v. Nicolas*, 2024 ME 34, ¶ 60, 314 A.3d 300, 317.

Plaintiffs' allegations are not actionable.  First, the term "process" does not refer to any filing or statement with which a plaintiff disagrees but rather refers to "orders that are issued by courts at the behest of one of the parties, or that are otherwise backed by judicial authority."  *Leighton v. Lowenberg*, 2023 ME 14, ¶ 15, 290 A.3d 68, 74.  These typically include "discovery, subpoenas, and attachment" or other "procedures for obtaining a lien."  *Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 23, 901 A.2d 189, 197.  The filing of an order from the state court for the federal court to consider when analyzing other pending motions is not a "use of process" because "[u]nlike a true instrument of legal process, the [defendant's filing] did not purport to compel [the plaintiff] to perform any legal obligation, and [the plaintiff] was free to ignore it . . . ."  *Jennings v. MacLean*, 2015 ME 42, ¶ 8, 114 A.3d 667, 669.

Second, Plaintiffs have not alleged facts that would support a finding of an ulterior motive or that the filing was otherwise improper.  Defendants filed the document for the court to consider, and there is no ulterior motive evident from the complaint or from the record.  Even if, as Plaintiffs suggest, the state court's order could be deemed void for lack of jurisdiction, the mere filing of the document would not establish an ulterior motive. More importantly, Plaintiffs have not demonstrated that the state court order was void as they have not shown that the removal process was complete, divesting the state court of jurisdiction.  *See* 28 U.S.C. § 1446(d) ("Promptly after the filing of such notice of removal of a civil action" in federal court, "the defendant . . . shall give written notice thereof to all adverse parties *and shall file a copy of the notice with the clerk of such State court*, which shall effect the removal and the State court shall proceed no further unless and until the case is remanded") (emphasis added); *Berberian v. Gibney*, 514 F.2d 790, 792–93 (1st Cir. 1975) ("the jurisdiction of the federal court attaches as soon as the petition for removal is filed with it" but "both state and federal courts have jurisdiction until the process of removal is completed" when "a copy of the removal petition [is] filed with [the state court]").

Finally, even if the order was void and even assuming it was an improper use of process to file the order for the federal court's consideration, Plaintiffs cannot show any harm or damages.  *See Tanguay v. Asen*, 1998 ME 277, ¶ 5, 722 A.2d 49, 50 (to recover, a plaintiff must show there was an abuse of process "resulting in damage to the plaintiff"). The record in the federal case demonstrates that the state court order played no role in the decision to remand the case to state court.  The order on the motion to remand explained

the Court's reasons for remanding, and the Court did not refer to the state court order. Indeed, when ruling on a motion in this case, the Court made clear that the Court's remand order was not based on the state court order.  *See* Order on Motion to Recuse at 8, ECF No. 24 ("contrary to the [Plaintiffs'] contention, Justice Mallonee's order did not affect my ruling on the motion to remand, which was instead based on a lack of federal question jurisdiction and an untimely removal")).

## G.      Breach of Fiduciary Duty

In Count VIII, Plaintiffs allege breach of fiduciary duty claims (1) against the bank for wrongfully classifying the property and pursuing foreclosure as well as pursuing an insurance claim without Plaintiffs' consent, and (2) against the two law firms for submitting the state court order to the federal court in connection with the motion to remand.  "Under Maine common law, the elements of a breach of fiduciary claim are (1) a fiduciary relationship between the plaintiff and another person, (2) a breach of the other person's fiduciary duty toward the plaintiff, and (3) damages incurred by the plaintiff proximately caused by the breach."  *Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 12, 250 A.3d 122, 127.  "A fiduciary duty will be found to exist, as a matter of law, only in circumstances where the law will recognize both the disparate positions of the parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue."  *Bryan R. v. Watchtower Bible & Tract Soc. of New York, Inc.*, 1999 ME 144, ¶ 20, 738 A.2d 839, 846.

Plaintiffs' allegations are insufficient to establish a fiduciary relationship with the bank or the two law firms.  One of the law firms represented the bank in its effort to pursue

the foreclosure on Plaintiffs' house, and the other law firm represented the bank in its efforts to defend against Plaintiffs' counterclaims, some of which raised the same issues as the claims in this case. Plaintiffs, in other words, allege the law firms were adversarial to Plaintiffs' interest and they do not allege any pre-existing relationship to suggest that either firm was a fiduciary. To the extent Plaintiffs maintain that the law firms had a fiduciary obligation because their client (i.e., the bank) had such an obligation, Plaintiffs' allegations are insufficient as the Law Court generally teaches that a fiduciary relationship does not result from arm's length business transactions, such as lenders and borrowers. *See e.g.*, *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 12, 762 A.2d 44, 46 (finding no fiduciary relationship between bank and borrower outside of unusual circumstances like when a bank takes almost complete control over the business of a bankrupt debtor); *Camden Nat. Bank v. Crest Const., Inc.*, 2008 ME 113, ¶ 15, 952 A.2d 213, 217 (reasoning in the context of a judicial foreclosure proceeding that "[i]f a lender-borrower relationship alone does not give rise to a fiduciary duty, then a relationship of a mortgagee-mortgagor alone likewise is not sufficient to create such a fiduciary duty"); *Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 19, 133 A.3d 1021, 1028 ("In the absence of specific facts sufficient to support the elements of a fiduciary relationship, a mortgagee foreclosing by power of sale does not owe a fiduciary duty to the mortgagor").

## H.    Negligence

Plaintiffs contend in Count IX that the real estate company negligently caused or contributed to the water damage by failing to manage and monitor the property. To prove a negligence claim, a plaintiff must establish "a duty owed, a breach of that duty, and an

injury to the plaintiff that is proximately caused by a breach of that duty." *Stanton v. Univ. of Maine Sys.*, 2001 ME 96, ¶ 7, 773 A.2d 1045, 1049. In general, "[w]hether a party owes a duty of care to another is a question of law," while "the breach and proximate cause issues are questions of fact." *Welch v. McCarthy*, 677 A.2d 1066, 1069 (Me. 1996). Plaintiffs do not refer to, and I am not aware of, any statutory or common law duty of care for listing agents to manage and monitor the listed property. If there was a duty, therefore, it sounds in contract, not negligence.

Plaintiffs did not provide a copy of an agreement or describe the terms of any agreement with Defendant Progressive. Plaintiffs also did not allege that they entered into an oral agreement with Defendant Progressive to manage, maintain, or monitor the property. Plaintiffs allege that they agreed to list the house through Defendant Progressive, but they do not allege a breach related to a listing service contract. *See, e.g.*, *Fracassini v. O'Connor Real Est.*, No. CV 960329315S, 2000 WL 893234, at *4 (Conn. Super. Ct. June 15, 2000) ("In reviewing the listing agreement and lock box agreement, there is nothing contained therein to impose any liability on the defendants to manage, control or inspect the premises," and the words alleged "are not sufficient to establish an oral agreement to manage or inspect the premises"). Without any facts regarding the terms of a written or enforceable oral agreement between the parties that would impose a duty to manage, maintain, or monitor the property, there is no basis to infer that the agency had a duty to act in a way that would prevent the water damage. The negligence claim, therefore, fails.

I.     **Civil Conspiracy**

Plaintiffs also alleged a civil conspiracy in Count VII, but the claim is not actionable because the filings do not contain any non-conclusory facts to plausibly support the existence of a conspiracy and because Plaintiffs have not stated a claim for any other underlying tort.  *See Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 8, 708 A.2d 283, 286 ("absent the actual commission of some independently recognized tort, a claim for civil liability for conspiracy fails").

CONCLUSION

Based on the foregoing analysis, after a review in accordance with 28 U.S.C. § 1915, I recommend the Court dismiss the complaint.

**NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 30th day of September, 2024.